# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 C 9184 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | Hon. Judge Dow., presiding |
| Detectives KENNETH BOUDREAU, | ) | |
| RICHARD PALADINO, JAMES | ) | |
| CASSIDY, THOMAS COUGHLIN, | ) | |
| WILLIAM FOLEY, FRANK VALADEZ | ) | |
| and PAT MCCAFFERTY, Chicago Police | ) | |
| Sergeant LAWRENCE TUDIER, Cook | ) | JURY TRIAL DEMANDED |
| County Assistant State's Attorneys | ) | |
| FABIO VALENTINI and TERENCE | ) | |
| JOHNSON, COOK COUNTY, ILLINOIS, | ) | |
| and as-yet Unknown Current or Former | ) | |
| City of Chicago Employees, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff, HAROLD RICHARDSON, by his attorneys LOEVY

& LOEVY, and complaining of Defendants CITY OF CHICAGO, Chicago Police

Detectives KENNETH BOUDREAU, RICHARD PALADINO, JAMES CASSIDY,

THOMAS COUGHLIN, WILLIAM FOLEY, FRANK VALADEZ, and PAT

MCCAFFERTY, Chicago Police Sergeant LAWRENCE TUDIER, Cook County

Assistant State's Attorneys FABIO VALENTINI and TERENCE JOHNSON, COOK

COUNTY, ILLINOIS, and as-yet Unknown Current and Former City of Chicago

Employees, and states as follows:

1

## INTRODUCTION

1.     Plaintiff Harold Richardson spent nearly half of his life in prison for a crime he did not commit.

2.     Harold was arrested at the age of sixteen for the brutal strangulation-murder and rape of a woman named Nina Glover. Ms. Glover's nude body was found in a dumpster, wrapped in a sheet, on the morning of November 7, 1994.

3.     Harold was innocent, and had nothing to do with the crime. No physical evidence connected him to the crime. The sum total of evidence against him was his false confession, which was fabricated and coerced by Chicago Police Department (CPD) officers, several of whom have long and notorious histories of similar acts of misconduct. The CPD officers fabricated and coerced Harold's confession in conjunction with two Cook County Assistant State's Attorneys from the Felony Review Unit who were investigating the case with the officers.

4.     Although Harold and his four teenaged co-defendants all confessed to raping and murdering the victim, evidence available at the time of Harold's conviction, including DNA evidence, excluded him and each of his co-defendants as the perpetrators of the murder.

5.     The force of the Defendants' misconduct, however, was enough to overcome the DNA exclusions and secure convictions against Harold and three of his co-defendants.

6.     Harold was wrongfully convicted and sentenced to spend the next 40 years of his life in prison.

2

7.     Recent DNA testing revealed that the rape and murder was committed by a single perpetrator named Johnny Douglas. At the time of Ms. Glover's murder, Douglas was more than twice Harold's age, and was a convicted felon with a lengthy criminal history involving physical violence. Remarkably, Douglas was at the crime scene on the morning that Ms. Glover's body was discovered, and was one of the first people the police interviewed. Neither Harold nor any of his juvenile co-defendants (ranging in age from 15 to 18 years old) knew Douglas or had any association with him.

8.     Although Douglas was known to the police at the time the victim's body was discovered, the Defendant Officers, in agreement with the ASAs, instead focused their attention on framing Plaintiff and his co-defendants. Tragically, Douglas was allowed to remain free as a result and was later convicted of the strangulation-murder of a prostitute named Gytonne Marsh, charged with the strangulation-murder of another prostitute named Elaine Martin, and implicated in at least five other violent physical and sexual assaults of prostitutes between 1993 and 1997.

9.     Almost fifteen years after their convictions, Plaintiff and his co-defendants were exonerated when DNA evidence confirmed that they were in fact innocent of the rape and murder.

10.     Sixteen years, eight months, and nine days after he was robbed of his freedom for a crime he did not commit, Harold Richardson walked out of prison a

free man. The State of Illinois granted Harold and each of his co-defendants a certificate of innocence on September 14, 2012.

11.     Just sixteen years old when he was arrested, Harold spent the most formative years of his life surrounded by dangerous and hardened criminals, separated from his family and friends, and robbed of the most basic of freedoms. While incarcerated, Harold also lost his oldest brother, whom he idolized and considered a second father; he was killed shortly after Harold's arrest, while bringing home money the family was going to use to pay for Harold's criminal defense attorney. Harold files this civil rights action to bring the Defendants' misconduct to light, to ensure that they are held accountable for their actions, and to seek justice for nearly 17 years of imprisonment for a crime he did not commit.

## Jurisdiction and Venue

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred in this judicial district and Defendant City of Chicago is a municipal corporation located here.

## The Parties

15.     Plaintiff Harold Richardson is 34 years old. He lives in South Bend, Indiana. At the time of the victim's murder, Harold lived with his family in the

Englewood area of Chicago. He was just 16 years old and enrolled at Thomas Kelly

High School in Chicago, Illinois.

16.     At all relevant times, Defendants Kenneth Boudreau, Richard

Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and

Patrick McCafferty were detectives with the Chicago Police Department; all were

employed by Defendant City of Chicago and acting within the scope of their

employment. They are sued in their individual capacities.

17.     At all relevant times, Defendant Lawrence Tudier was a sergeant with

the Chicago Police Department; employed by Defendant City of Chicago, and acting

within the scope of his employment. Mr. Tudier is sued in his individual capacity.

18.     Defendants Boudreau, Paladino, Cassidy, Coughlin, Foley, Valadez,

McCafferty, Tuldier, and as-yet Unknown Current or Former City of Chicago

Employees are referred to collectively as the "Defendant Officers."

19.     At all times relevant, Defendants Fabio Valentini and Terence Johnson

were Assistant State's Attorneys in the Felony Review unit of the Cook County

State's Attorney's Office (CCSAO), and employed by the Cook County State's

Attorney's Office. They are sued in their individual capacities.

20.     The Defendant City of Chicago is a municipal corporation under the

laws of the State of Illinois.

21.     Defendant Cook County is a governmental entity within the State of

Illinois, which consists in part of its Cook County State's Attorney's Office, and was

5

at all relevant times the employer of Defendants Terence Johnson and Fabio Valentini. Defendant Cook County is a necessary party to this lawsuit.

### The Glover Murder

22.     At approximately 7 a.m. on November 7, 1994, Nina Glover's nude body was discovered in a dumpster behind the Family Super Mart Liquor Store at 1400 W. Garfield.  Her body was wrapped in a blood-stained bedsheet, along with her clothing and shoes.  An autopsy revealed that Ms. Glover had been killed by strangulation.

23.     Defendant Cassidy and other Chicago Police Department personnel were assigned to investigate the crime.  When Defendant Cassidy arrived at the crime scene, four individuals identified themselves: the garbage truck driver who had discovered the body, an assistant manager for the liquor store, a neighborhood resident who lived around the corner, and Johnny Douglas.

24.     Douglas was a convicted felon with a lengthy and violent criminal history—between July 1980 and April 1998, Douglas was arrested 83 times and convicted of crimes 38 times. Nor was this Douglas's first rape or assault. His prior crimes included:

   a. On March 5, 1993, over two years before killing Ms. Glover, Douglas paid Debra Gibson to have sex with him and then assaulted her, hitting her head with a rock.

6

b. On May 5, 1993, Douglas attempted to force Brena Hillie to have oral sex with him. When she tried to escape, he beat her with a stick and cut her with broken glass.

c. On July 10, 1994, four months before killing Ms. Glover, Douglas met with a woman named Caprice Bramlett—in the exact same neighborhood where he would later meet with Ms. Glover. Douglas raped Ms. Bramlett twice, and choked her. Douglas was convicted of aggravated sexual assault based on this incident and sentenced to six months in prison, but with good time credit served half of that.

d. On October 21, 1994, shortly after his release from prison and just weeks before meeting Ms. Glover, Douglas attempted to rape a woman named Hazel Speight. He grabbed her and demanded she undress, but someone interrupted Douglas before he could complete the rape.

25. Defendant Cassidy learned that Douglas lived nearly ten miles from the crime scene, and that he had no explanation for his presence in the alley on that early Monday morning.

26. Douglas was an obvious prime suspect in the murder, and all of the information detailed above about Douglas's prior criminal history was known to Chicago law enforcement when they encountered him on the morning of November 7, 1994. On information and belief, the Defendant Officers failed to run Douglas's background, which would have alerted them to his significant criminal history.

27.     After Defendant Officers failed to pursue Douglas at the time of Ms.

Glover's murder, Douglas went on to terrorize many other women in Chicago. For

example:

      a.  On June 17, 1995, a little over 6 months after killing Ms. Glover,

Douglas raped and murdered Elaine Martin, along with her unborn

child, while she was engaged in prostitution. As he had done with Ms.

Glover, Douglas strangled Ms. Martin and left her body in a public

location.

      b.  On April 14, 1997, Douglas raped and strangled another woman:

Gytonne Marsh. Like Ms. Glover and Ms. Martin, Ms. Marsh's body

was found discarded in public, in a garage. Douglas pled guilty to Ms.

Marsh's murder many years later; he admitted to having sex with Ms.

Marsh in exchange for cocaine, and choking her to death while they

had sex.

      c.  On September 28, 1997, a few months after killing Ms. Marsh, Douglas

raped Catie Oakes in his parents' garage. His DNA was later recovered

from her clothing.

28.     During the Cook County State's Attorney's prosecution of Douglas for

one of these crimes, the prosecutors sought to introduce evidence of Douglas's

"modus operandi," including physically assaulting and later strangling women after

exchanging drugs for sex, and then abandoning their bodies in public locations. The

prosecutors also pointed out that when Douglas was confronted with the charges

that he had beaten and sexually assaulted five separate women, he admitted doing

so, but said that "nobody believed them because they were 'just whores.'"

29.     Douglas's violence against women finally came to an end in 2008,

when he was killed by Minosa Winters, who claimed self-defense. During the

prosecution of Ms. Winters for Douglas's death, the State's Attorney's Office

stipulated to Douglas's reputation in the community for violence, and that Douglas

was "a major bully in the area who had violently attacked other people." Ms.

Winters was acquitted.

30.     Despite the mountain of evidence against Douglas, Defendant Officers

investigating the Glover murder in November 1994 failed to link Douglas to Ms.

Glover's death.

31.     Instead, the investigation into Ms. Glover's murder came to a

standstill. Until, four months later, they came across a learning-disabled teenager

named Jerry Fincher.

### The Interrogation and Creation of
### The False Cases Against The Teenagers

32.     On the night of March 7, 1995, the Defendant Officers approached

Jerry Fincher and a friend who were standing on the street outside Jerry's home, a

few blocks from the alley where Ms. Glover's body had been found.  The Defendant

Officers frisked Jerry and his friend, threatened to plant crack cocaine rocks on

them, and asked them about Ms. Glover's murder.

9

33.     Jerry honestly informed the Defendant Officers that he remembered a woman's body having been found in a nearby dumpster a few months back, and he told them that he and a friend had seen the police take the body away.

34.     This, apparently, was the break the Defendant Officers were looking for.  The Defendant Officers handcuffed Jerry, held him in their car at gunpoint, and took him to the Area One Detective Division at 51st and Wentworth.

35.     Jerry was detained at the police station for nearly two days.  Despite telling the Defendant Officers that he knew nothing about the crime and was not in any way involved in it, he was kept in handcuffs, forced to spend two sleepless nights in interrogation rooms, and threatened with physical violence.  The Defendant Officers, including Defendant Valadez, fed him details of the crime and told him that he would go to prison for the murder unless he cooperated.  At one point, one of the Defendant Officers placed a phone book against his chest and pounded the phone book with a flashlight, hurting the boy, and directed him to cooperate.

36.     The Defendant Officers told him that if he cooperated, he could go home. Defendant ASA Johnson participated in the interrogation of Jerry Fincher along with Defendant Officers.

37.     Over the course of those two days, Jerry acquiesced. He began to regurgitate the details that the Defendant Officers were telling him about the murder.

10

38.     The Defendant Officers described a false scenario where he, along with other neighborhood teenagers, had taken Ms. Glover to a basement at approximately 9 p.m. on November 6th, gang raped her, strangled her, and disposed of her body in the dumpster.  Over time, the Defendant Officers minimized his role in the murder, saying that they knew he had simply stood watch as the other teens raped and murdered her.

39.     Assistant State's Attorney ("ASA") Terence Johnson participated in the interrogation of Jerry Fincher along with the Defendant Officers.

40.     Eventually, Jerry acquiesced. Due to the Defendant Officers' and Defendant Johnson's coercive efforts, Jerry agreed to the details that the Defendants were feeding him about the murder. ASA Johnson took the coerced and fabricated statement from Jerry and reduced it to writing on March 9, 1995.

41.     Defendants were able to get Jerry Fincher to implicate four other neighborhood teenagers in the murder: Plaintiff Harold Richardson, Vincent Thames, Terrill Swift, and Michael Saunders. Like Fincher, none of these teenagers were involved in the rape or murder of Ms. Glover, and none knew true perpetrator Johnny Douglas or otherwise had any nonpublic knowledge about the Glover rape and murder.





44.     The Defendant Officers, ASA Johnson, and ASA Valentini knew Jerry's statement was coerced and false and merely a recitation of their fabrications. Nevertheless, with Jerry's "confession" secured, the Defendant Officers set out to round up the rest of the teens mentioned in Jerry's coerced statement in order to continue building their case.

45.     Over the course of the next few days, Defendant Officers, working agreement and in concert with Defendant ASAs Johnson and Valentini, coerced each juvenile to "confessing" to taking part in the rape and murder of Ms. Glover.

46.     On March 9th, the Defendant Officers took Vincent Thames from his home and transported him to the police station, where he was handcuffed to the wall of an interrogation room. Vincent was 18 years old and living at home at the time of the murder. He had no experience with police interrogation.

47.     Defendants McCafferty, Cassidy and Paladino threatened that he would get natural life in prison unless he "confessed" to his involvement in Ms. Glover's murder. He told the Defendant Officers that he did not know anything

about the murder, and had nothing to do with the murder. Defendant Johnson participated in Vincent's interrogation, along with Defendant Officers.

48.     Over the course of several hours, the Defendant Officers pursued various measures intended to coerce Vincent into falsely confessing. Frightened by their threats, and believing the Defendant Officers' promises that they would release him if he went along with the Defendant Officers' story, Vincent succumbed to their pressure.

49.     Due entirely to the Defendant Officers' and Defendant Johnson's coercion, Vincent agreed to the Defendant Officers' fabrications in a final recorded statement on March 9, 1995, which implicated Plaintiff Harold Richardson, Jerry Fincher, Terrill Swift, and Michael Saunders. While taking his statement, Defendants would correct Vincent's words and statements where they did not line up with the story that Defendant Officers had made up. Defendant ASAs were aware that Vincent was being coerced and fed information, but recorded the confession and reinforced the promise that Vincent would be freed if he cooperated.

50.     Vincent Thames was innocent and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself but for the Defendants' misconduct.

51.     The Defendant Officers next sought out Terrill Swift. The Defendant Officers took seventeen-year-old Terrill from his father's home and down to the police station, where they interrogated him for hours outside the presence of parents, a guardian, or an attorney. Terrill told the Defendant Officers that he did

not know anything about the murder, and that he had nothing to do with the murder. The Defendant Officers ignored his multiple requests that he be allowed to call his mother.

52.     The Defendant Officers, including Defendants Paladino and Boudreau, instead fed Terrill details of the Glover murder and repeatedly instructed him to implicate himself and the other teenagers in the crime. They made false promises of leniency, reinforced by Defendant Johnson, repeatedly assuring Terrill that if he agreed to repeat and sign the confession they had concocted for him then he would be free to go home. They also made it clear that if he did not confess, he would remain in their custody.

53.     As a result of hours of improper and undue pressure, inflicted on a teenager who had little experience with law enforcement, Terrill eventually falsely implicated himself, Plaintiff, Jerry Fincher, Vincent Thames, and Michael Saunders in an oral statement and in a court-reported statement.

54.     The Defendant Officers knew that Terrill's statement was coerced and false and merely a recitation of their fabrications. During his confession, Defendants would correct his words and statements where they did not line up with the story that Defendant Officers expected and desired. Defendant ASAs were aware that Terrill was being coerced and fed information, but recorded the confession and reinforced the promise that he would be freed if he cooperated.

55.     Terrill Swift was innocent and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself in the crime but for the Defendant Officers' and Defendant ASAs' misconduct.

56.     The Defendant Officers then turned their attention to Plaintiff Harold Richardson. At the time of Ms. Glover's murder, Harold was 16 years old, lived with his parents, siblings, a nephew, and a great aunt, and was enrolled at Kelly High School.

57.     On the night of March 9, 1995, the Harold Richardson was arrested by the Defendants as he was walking home from a friend's house. The Defendant Officers told him, in sum and substance, that they had caught him in front of "the crime scene," and they threatened to take him to the nearby viaduct and kill him. Mr. Richardson was terrified and did not know what was happening.

58.     Harold was taken to the police station, where the Defendant Officers, including Defendants Paladino, Cassidy and Coughlin, interrogated Harold outside the presence of a parent, guardian, or a youth officer. They handcuffed him to the wall of an interrogation room, fed him details of Ms. Glover's murder, and pressured him to implicate himself in the crime.

59.     Harold did not know Ms. Glover and he knew nothing about Ms. Glover's murder. He told this to the Defendant Officers.

60.     The Defendant Officers told Harold that they had evidence he was guilty. They told him that other teenagers had given confessions that squarely implicated him in the murder. Harold vaguely knew one of the teenagers they

15

mentioned, Jerry Fincher, and was friendly with the other two, Terrill Swift and Vincent Thames. Harold again told the Defendant Officers that he did not know anything about the crime, or why those teenagers named him as a participant.

61. At some point, the Defendant Officers took Harold to a room with a two-way mirror, where he could see Vincent Thames. They left Harold in there briefly so that he could watch, but not hear, Vincent Thames give what appeared to be a statement. They ultimately took Harold back to the interrogation room, where they pressured him to confess.

62. The Defendant Officers made false promises of leniency, assuring him that they would release him if he provided a statement.

63. As a result of hours of improper and undue pressure, beginning with his arrest, all of which was outside the presence of his parents or an attorney, Harold eventually gave in, and agreed to repeat the false account of the Glover rape and murder that the Defendant Officers' had provided to him. In an oral statement, Harold falsely implicated himself, Vincent Thames, Jerry Fincher, Terrill Swift, and Michael Saunders, as the Defendant Officers had instructed.





67.     Harold was innocent of the crime and had nothing to do with Ms. Glover's murder. He would not have falsely implicated himself but for the Defendants' misconduct.

68.     The Defendant Officers and Defendant ASAs knew that Harold's statement was coerced and false and merely a recitation of their fabrications.

69.     Ultimately, after making an oral statement, Harold refused to sign a written statement documenting his confession, knowing that it was untrue.

70.     Though Defendants had written out a confession for Harold to sign, after he refused to sign it, they destroyed the version of the statement that they had

17

prepared. Even though he had not signed the document, Harold was charged with first degree murder and aggravated sexual assault and taken to jail.

71.     Michael Saunders, just 15 at the time, was the last to be arrested. The Defendant Officers located him, handcuffed him, and took him to the police station. There, the Defendant Officers interrogated him for hours, ignoring his requests for his mother and for an attorney.

72.     The Defendant Officers threatened Michael with physical harm, at one point ripping an earring out of his ear and threatening to take him to the railroad tracks behind the police station and shoot him.

73.     As a result of the hours of coercion and threats, Michael eventually signed a statement falsely implicating himself, Plaintiff, Vincent Thames, Terrill Swift, and Jerry Fincher.  Like Plaintiff Harold Richardson's unsigned statement, Saunders' statement was a fabrication, written entirely by Defendant ASA Fabio Valentini—who had been working with ASA Johnson and the Defendant Officers. Michael signed the statement without reading it, believing that after doing so, he would be permitted to go home.

74.     The Defendants knew that Michael's statement was coerced and false and merely a recitation of their fabrications.

75.     Michael Saunders was innocent and had nothing to do with Ms. Glover's murder.  He would not have falsely implicated himself but for the Defendants' misconduct.

76.     On the sole basis of the Defendants' coercions and fabrications, each of the teenagers, including Plaintiff, was charged with first degree murder and aggravated sexual assault.

77.     The Defendant deliberately fed the teenagers details of the Glover murder so that their "confessions" would appear reliable. In particular, the Defendant Officers told Harold and the others that Ms. Glover was strangled to death; that she was a known drug user and prostitute; that when her body was found, she was naked and there was evidence suggesting she had been sexually assaulted; that she had lacerations and bruises on her face, suggesting she had been hit with a sharp object and physically assaulted; and that she was found in a dumpster, wrapped in a white sheet with gold flowers. Each of the teenagers included those details in their false "confessions." When the teenagers did not regurgitate exactly those facts during their confessions to Defendant ASAs, the Defendant Officers forced the boys to change their statements so that they would be consistent with one another. Both Defendant Officers and Defendant ASAs understood that these confessions were fabricated and coerced.

78.     The Defendant Officers never disclosed their misconduct. Furthermore, the Defendants failed to document any of the teenagers' truthful exculpatory statements, and never revealed to anyone that any exculpatory statements had been made. In written reports and conversations with trial prosecutors, Defendant Officers and Defendant ASAs falsely represented the circumstances under which

19

the boys' "confessions" were obtained, claiming that they had originated with the boys themselves.

79. Well before his trial, both the Defendant Officers and ASA Defendants fabricated reports purporting to memorialize Harold's oral confession. Those reports concealed the coercion used to obtain Harold's and his co-defendants' false statements. The Defendants also falsely represented in their written reports and conversations with trial prosecutors that the information in Harold's oral confession had originated with Harold, when in reality it had all come from Defendants.







**Plaintiff's Wrongful Conviction**

88. In November 1997, Harold Richardson stood trial for the rape and murder of Nina Glover.

89. No physical evidence ever linked Harold to the crime. In fact, DNA testing affirmatively excluded him as the perpetrator. The prosecutors relied nearly singularly on Harold's false and coerced oral confession.

90. The Defendants were aware of this evidence but nevertheless continue to misrepresent the circumstances under which they had obtained the statements

from the five teenagers, concealing the coercion they had used and the fact that the information in the confessions had been fed to the teenagers by the Defendants. The Defendants failed to investigate other leads, such as Johnny Douglas—a man with a lengthy and violent criminal past who was inexplicably present at the crime scene the morning Nina Glover's body was discovered.

91.     As a proximate result of the above-described misconduct on the part of the Defendant Officers and Defendant ASAs, Harold was convicted in a bench trial. In explaining his ruling, Judge Sumner stated, "Obviously, the whole question comes down to the statement . . . The fact of the matter [is] I believe the statement. That's really all I need."

92.     When he found Harold guilty, Judge Sumner did not know that Harold's confession had been coerced by Defendant Officers and Defendant ASAs. The Defendants who testified at Harold's pre-trial suppression hearing and at his trial, including Defendant Paladino, Defendant Cassidy, Defendant Boudreau, Defendant Coughlin, and Defendant Johnson, did not admit that they had fabricated the confession. Each of these Defendants followed an affirmative plan generated by the Defendant Officers, which included coordinated perjury of each Defendant at the suppression hearing, to conceal the fact that Harold's confession was false and that it was the product of police coercion.

93.     Because the Defendants concealed from the judge, the trial prosecutors, and Harold Richardson and his attorney that they had fabricated the confessions of Harold's co-defendants, Harold was unable to call the boys as

23

witnesses who could testify at his confession, which alleged each of their participation in the crime, was fabricated and false.

94.     But for the Defendants' misconduct, Plaintiff would have been neither prosecuted nor convicted.

95.     On January 27, 1998, Plaintiff was sentenced to 40 years in prison.

## The Other Teenagers Are Wrongfully Convicted

96.     On the basis of their confessions, Terrill Swift and Michael Saunders were also convicted after bench trials. Terrill was sentenced to 36 years in prison, and Michael to 40. In light of the outcomes of his co-defendants' trials, which all proceeded before his, Vincent Thames pled guilty and was sentenced to 30 years in prison.

97.     Jerry Fincher's "confession" was deemed to be illegally obtained and excluded following a suppression hearing. Without any other evidence to convict him, the prosecutors dropped all charges against him. Jerry Fincher was released in 1998 after having spent 3 ½ years in jail.

## Defendants' Pattern and Practice of Coercing False Confessions In Order to Secure Wrongful Convictions

98.     The Defendants' misconduct in this case was no isolated occurrence.

99.     Defendant Boudreau, for example, is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects, including juveniles and teenagers, to "confess" to serious violent crimes, including murder. Defendant

24

Cassidy had a similarly notorious history of coercing and manufacturing confessions from juveniles as young as seven years old.

100.    These Defendants' methods went far beyond acceptable police interrogation techniques. Indeed, in an examination of thousands of murder cases in Cook County from 1991 through 2000, the Chicago Tribune found that Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

101.    According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons.  In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth officer present; and of taking advantage of mentally retarded suspects and others with low IQs."

102.    In total, Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions.

103.    For a two-year period in the early 1990s, for example, Boudreau and his partner Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or his partner mistreated them to obtain false confessions.

104.    Some examples of abuses perpetrated by Boudreau, often in cooperation with other Defendant Officers, include the following, all of which are corroborated by sworn testimony:

a. Derrick Flewellen signed a confession coerced by Boudreau after being
interrogated for more than 36 hours, during which time he was
slapped, kicked, punched, and slammed into the wall by Boudreau and
other detectives before succumbing to their coercion.        After
spending almost five years in prison, Flewellen was acquitted of the
two murders when DNA tests proved the crime was committed by
someone else.

b. Boudreau obtained a murder confession from Alfonzia Neal, testifying
that Neal waived his rights and signed a statement handwritten by a
prosecutor.  Experts established that Neal had an IQ in the 40s, well
below the dividing line for mental retardation, and that he was
incapable of intelligently waiving his Miranda rights.  Neal was
acquitted notwithstanding his signed confession.

c. In December 1993, Boudreau and another detective "solved" two
separate murders with confessions from two mentally retarded
juveniles, Fred Ewing and Darnell Stokes, classmates in special-
education courses.  One expert concluded that Ewing "was unable to
comprehend the substance of the confession which he allegedly made."
Absent any other evidence connecting them to the crime, both were
acquitted despite the confessions obtained by Boudreau.

d. In 1998, Boudreau helped get a murder confession from a 13-year-old
boy with a verbal IQ of 59.  The judge later ruled that the boy did not

have the mental capacity to waive his rights and threw out the confession.  Prosecutors then dropped the charges.

e.  After police officer Michael Ceriale was shot to death in 1998, Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements.  Tolliver was never advised of his rights, no Miranda waiver was created, and his requests to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen.  After two trials, Tolliver was convicted of Ceriale's murder.

f.  In connection with the Ceriale murder, Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver.  The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours.   When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury, and at least one of them went to jail for it.

g.  Marcus Wiggins brought a lawsuit against Boudreau alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case.

Wiggins' mother had been denied access to her son, who was a 13-year old 8th grader at the time of the coerced confession. Six young suspects gave confessions. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. The remaining four were acquitted, including two who had been interrogated by Boudreau.

h. Antoine Word was placed in an interrogation room by Boudreau, where he was cuffed to a bench for prolonged periods, unable to use the bathroom (he urinated on the floor), and beaten. Boudreau told Word that other witnesses had placed him at the scene of a murder, but that he would let him go home and help him if he signed a statement saying that he gave another man a gun. After almost 48 hours in the room, Word signed the statement written out by Boudreau, and was convicted of murder.

i. Fabian Pico was 16 years old when he gave a self-incriminating statement to Boudreau which was then used to convict him of murder. When Pico moved to suppress the statement on the grounds that the police did not allow him access to his mother, Boudreau claimed that he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed, but this supposed attempted contact is not referenced anywhere in his written reports.

j.  After being beaten by Defendant Boudreau, Jesse Clemon signed a
    written statement with his left hand (because his right hand had been
    injured). Witnesses in the station heard hollering and protests of "I
    didn't do it." Boudreau testified that the statement was not coerced,
    but the judge suppressed it anyway due to the "horrendously
    oppressive" atmosphere at the station.

k.  Kilroy Watkins was arrested and handcuffed to a metal ring in an
    interrogation room by Boudreau, who then choked and punched him in
    order to get him to confess to a six-month old shooting.    After more
    than 30 hours in this room with minimal sleep and food, Watkins
    signed an incriminating statement.

l.  In 1992, Clayborn Smith was interrogated for 37 hours about a murder
    he knew nothing about.    When Mr. Smith professed his innocence,
    another detective kicked and punched his head and body, and
    Boudreau threatened to charge Mr. Smith's pregnant girlfriend if he
    did not confess. At one point, the detectives believed that they had
    successfully coerced Mr. Smith to confess, but when the Assistant
    State's Attorney ("ASA") entered the room, Mr. Smith continued to
    assert his innocence, whereupon the ASA left and the beating resumed.
    The same thing happened a second time, this time with another ASA,
    but again Mr. Smith refused to confess. When that ASA left the room,
    Boudreau and his partner resumed the beating, whereupon Mr. Smith,

29

deprived of both counsel and sleep for an inordinate time, finally signed a false confession.

m. Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging that he was framed for a murder in 1998.

n. Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Boudreau and others.

o. In 1995, Detective Boudreau and his partner interrogated and coerced confessions from Oscar Gomez, Eric Gomez, and Abel Quinoles. Their tactics included holding all three men for 30 hours, beating them while they were shackled to the wall, and preventing them from communicating with an attorney or their families, all in a successful attempt to coerce false confessions. All three defendants were found not guilty, based largely on the conclusion that the detectives, including Boudreau, physically coerced their confessions.

p. In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by Boudreau and his partner, who refused to let him contact his family and intimidated him into confessing to a murder he did not commit. Tyrone Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by Boudreau for murder despite the lack of any physical evidence or eye witnesses linking Escamilla to the crime. Boudreau tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After many hours of abuse, Escamilla eventually falsely confessed as well. Miguel Morales was also beaten during his interrogation. However, unlike Escamilla, Morales refused to confess. Boudreau then coerced a friend of Morales into stating that Morales had confessed to the murder over the phone. The witness recanted his statement at trial, and testified that he only gave the statement after he had been beaten for over twenty hours and threatened with prosecution until he falsely implicated Morales.

q. In 1998, Boudreau and his partner held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Boudreau placed a book on his chest and stomach and hit the book with a black jack, so as not to leave visible marks on Jackson's body. Meanwhile, Boudreau's partner, using a torture technique referred to in the Department as "bagging," placed a

typewriter cover over Jackson's head and cut off his air supply.   As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

r.  In 1991, fifteen year-old John Plummer was interrogated for 36 hours by Detective Boudreau and his partner. After being physically beaten, he falsely confessed to a murder.

s.  In 1992, Arnold Day was interrogated in connection with a murder investigation.  Mr. Day was isolated in an interrogation room for many hours while Detective Boudreau psychologically and physically tortured him until he finally confessed.

t.  In 1993, Richard Anthony was forced to confess to murder by Detective Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.  Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

u.  In 1995, Boudreau was part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in connection with a murder.

    v.   In 1993, Emmett White was arrested by Boudreau and another detective, who hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse.

105.   In addition to the above examples involving Defendant Boudreau, there are many other examples of similar misconduct by the other Defendant Officers. For example:

    a.   In 1987, Defendant Foley worked with other Chicago detectives to obtain a false confession from Frank Bounds for a murder. The detectives hit Bounds on the head and threatened to implicate Bounds's girlfriend in the murder if he did not confess.

    b.   In 1984, Defendant Cassidy forced an 11-year-old boy A.M. to confess to murdering an 83-year-old woman. The boy was unlawfully detained in the police station and interrogated outside the presence of either his parents or a youth officer. Although A.M. was wrongly convicted on the basis of this confession, his confession was ultimately suppressed and the adjudication was later expunged.

    c.   In 1997, Chicago police officers, including Defendant Cassidy, forced 13-year-old Jimie Haynes to confess to murder after being held in the station for more than 14 hours without a guardian or youth officer.

Prosecutors eventually dropped the charges after the confession was suppressed.

d. In 1998, Defendant Cassidy forced two other young boys, aged 7 and 8, to falsely confess to the murder of an 11-year-old boy. The two boys were later exonerated when forensic testing revealed that a 30-year-old man, Floyd Durr, had left semen on the victim's underwear and was the true perpetrator.

e. In November 1998, Chicago police officers, including Defendant Cassidy, coerced Steven Hudson into falsely confessing to a murder by beating him, shocking him, and threatening to arrest his girlfriend and take his son away if he did not confess. The statement was eventually suppressed and, as no other evidence implicated Hudson in the murder, the charges were dismissed.

f. In 1997, Defendant Coughlin obtained a false confession from Robert Wilson for attempted murder. Wilson was held in police custody for an extended period of time, physically abused, denied sleep, food and medication, intimidated, and promised leniency if he confessed.

g. In March 1997, Defendant Coughlin coerced another false murder confession from 15-year-old Eric Kittler. Kittler was held for 12 hours, deprived of food and sleep, threatened with physical harm, and told he could go home once he confessed. His mother was not allowed into the

interrogation room until he was about to sign the statement. Kittler was ultimately acquitted and settled a civil rights suit for $2 million.

106.    Part and parcel with this history of fostering egregious misconduct, the Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

107.    The wrongful conviction of innocent persons who gave coerced and false confessions include numerous cases in which Chicago Police Detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants; (c) the fabrication of confessions; (d) the misleading of parents and denial of parents' access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the form of a confession; and (h) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

108.    At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Chicago Police Department systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes

they did not commit. Youth are inherently more suggestible, they are vulnerable to manipulation, and they frequently lack the ability to fully understand—let alone assert-their rights during an interrogation.

109.    As a matter of widespread custom and practice, Chicago Police Department Detectives, including but not limited to the Defendants, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close cases.  Detectives systematically denied juvenile and teenager suspects access to their parents and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these teenagers to immense physical and mental pressure until they "confessed."

110.    Consistent with the municipal policy and practice described in the preceding paragraphs, members of the Chicago Police Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced confessions, both from the Trial Division of the Cook County State's Attorney's Office and from criminal defendants, whose co-defendants' coerced confessions were introduced against them at trial.





114.    As a matter of both policy and practice, municipal policy makers and
department supervisors condoned and facilitated a code of silence within the
Chicago Police Department. In accordance with this code, Chicago Police Detectives
refused to report and otherwise lied about misconduct committed by their
colleagues, including the misconduct at issue in this case. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████

115.    As a result of the City of Chicago's established practice of not tracking
and identifying police officers who are repeatedly accused of the same kinds of
serious misconduct; failing to investigate cases in which the police are implicated in
obtaining coerced and false confessions, as well as wrongful charges and
convictions; failing to discipline officers accused of this unlawful conduct; and
facilitating a code of silence within the Chicago Police Department, Chicago police
officers (including the Defendants here) have come to believe that they may violate
the civil rights of members of the public and cause innocent persons to be charged
with serious crimes without fear of adverse consequences. As a result of these
policies and practices of the City of Chicago, members of the Chicago Police
Department act with impunity when they violate the constitutional and civil rights
of citizens, including the youngest and most vulnerable members of society.

116.    The City's failure to train, supervise, and discipline its officers
effectively condones, ratifies, and sanctions the kind of misconduct that the
Defendant Officers committed against Plaintiff in this case. Constitutional

violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

117.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

118.    The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Exoneration

119.    Throughout his prosecution and incarceration, Harold Richardson maintained his innocence and pursued all possible avenues to prove it.

120.    In February 24, 2011, Plaintiff joined Terrill Swift and Michael Saunders in filing a motion for post-conviction DNA testing.

121.    Cellmark Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts collected from Ms. Glover post-mortem.

122.    Despite the "confessions" claiming that four of the co-defendants had intercourse with the victim, the testing revealed that only one person had left DNA in the victim. That person, as everyone knew, was not Harold or any of his co-defendants.

123.    On May 13, 2011, the Illinois State Police submitted the DNA profile to the Combined DNA Index System (CODIS) database, which returned a match to the DNA profile of Johnny Douglas, the convicted felon who was inexplicably present when the body was found in the early morning hours of November 7, 1994.

124.    On May 29, 2011, Harold Richardson and his co-defendants filed a joint petition to vacate their convictions. The Circuit Court of Cook County granted the joint petition on November 16, 2011. Shortly thereafter, the Cook County State's Attorney's Office stated they would *nolle prosequi* future charges.

125.    On September 14, 2012, the State of Illinois granted Mr. Richardson a certificate of innocence.

### Plaintiff's Damages

126.    Harold Richardson spent more than 16 ½ years in prison for a crime he did not commit. He must now attempt to make a life for himself outside of prison without the benefit of nearly two decades of life experiences—including his adolescence and young adulthood—which normally equip adults for that task.

127.    Additionally, the emotional pain and suffering caused by losing these formative years has been substantial. Harold was taken from his family when he was just 16 years old. During his incarceration, he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to have girlfriends, to fall in love,

to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. Several relatives died while he was incarcerated, including, most painfully, his oldest brother. Harold was denied the opportunity to attend their funerals, and continues to struggle to find a means to grieve.

128. As a result of the foregoing, Harold Richardson has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Fifth Amendment

129. Each paragraph of this Complaint is incorporated as if restated fully herein.

130. In the manner described more fully above, the Defendant Officers and ASAs, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

131. As described more fully above, the Defendant Officers and Defendant ASAs conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the rape and murder of Nina Glover.

132. The false statements created, written, and coerced by the Defendant Officers and Defendant ASAs, and attributed to Plaintiff, were used against

Plaintiff to his detriment in a criminal case. These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Ms. Glover.

133.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

134.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

136.    As described more fully above, all of the Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

137.    In the manner described more fully above, the Defendants individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence which caused the conviction of Plaintiff. This misconduct includes: fabricating that the nonpublic information about the crime had originated with Plaintiff and his co-defendants, when it had actually been fed to them by the Defendants; fabricating reports purporting to official memorialize oral confession

that he refused to sign, as well as other reports purporting to memorialize Plaintiff's statement's.

138.    In the manner described more fully above, the Defendants individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory and impeachment evidence—such as the teenagers truthful exculpatory statements, the Defendants' coercion that resulted in the co-defendants' fabricated confessions, and the original statement that the Defendants attempted to have Plaintiff sign—from the ASAs assigned to prosecute the case, the Court, and the defense. By failing to disclose this information, Defendants violated their clearly established duty to report all exculpatory material and impeachment information to a competent authority.

139.    Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

140.    The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

141.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

142.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

### Count III – 42 U.S.C. § 1983
### Failure to Intervene

143.    Each paragraph of this Complaint is incorporated as if restated fully herein.

144.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

145.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

146.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

### Count IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

147.    Each paragraph of this Complaint is incorporated as if restated fully herein.

148.    After the murder of Ms. Glover, the Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

149.    Additionally, before and after Plaintiff's conviction, the Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

150.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

151.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, coercing false confessions, committing perjury during hearing and trials—and was an otherwise willful participant in joint activity.

152.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

### Count V – 42 U.S.C. § 1983
### Supervisory Liability

154.    Each paragraph of this Complaint is incorporated as if restated fully herein.

155.    The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Tudier, when they failed to adequately train and supervise the individual Defendant Officers.

156.    Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

157.    Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these defendants and other employees to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff

158.   These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

159.   The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

160.   The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count VI – 42 U.S.C. § 1983
### *Monell* Claim

161.   Each paragraph in this Complaint is incorporated as if restated fully herein.

162.   The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Chicago Police Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, set forth in greater detail above.

163.    The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

164.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

165.    The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

### Count VII – State Law Claim
### Malicious Prosecution

166.    Each paragraph of this Complaint is incorporated as if restated fully herein.

167.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

168.    The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

169.    Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendants also fabricated evidence by coercing false inculpatory testimony from co-defendants. The Defendants were aware that, as described more fully above, no

48

true or reliable evidence implicated Plaintiff in the Glover strangulation-murder, all inculpatory evidence was coerced and fabricated, and forensic evidence indicated Plaintiff's innocence. Furthermore, the Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

170. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

171. Plaintiff's conviction was vacated on November 16, 2011, and the prosecution terminated in Plaintiff's favor on January 17, 2012, when the Cook County State's Attorney's Office agreed to *nolle prosequi* future charges. On September 14, 2012, Plaintiff was granted a Certificate of Innocence by the State of Illinois.

172. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**Count VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**

173. Each paragraph of this Complaint is incorporated as if restated fully herein.

174. The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power

49

or authority, and they were undertaken with intent to cause, or were in reckless

disregard of the probability that their conduct would cause, severe emotional

distress to Plaintiff, as is more fully alleged above.

175.    As a direct and proximate result of the Defendants' actions, Plaintiff

suffered and continues to suffer severe emotional distress.

### Count IX – State Law Claim
### Civil Conspiracy

176.    Each paragraph of this Complaint is incorporated as if restated fully

herein.

177.    As described more fully in the preceding paragraphs, the Defendants,

acting in concert with other known and unknown co-conspirators, conspired by

concerted action to accomplish an unlawful purpose by unlawful means.

178.    In furtherance of the conspiracy, the Defendants committed overt acts

and were otherwise willful participants in joint activity including but not limited to

the malicious prosecution of Plaintiff and the intentional infliction of emotional

distress upon him.

179.    The misconduct described in this Count was undertaken intentionally,

with malice, willfulness, and reckless indifference to the rights of others.

180.    As a direct and proximate result of the Defendants' conspiracy,

Plaintiff suffered damages, including severe emotional distress and anguish, as is

more fully alleged above.

## Count X – State Law Claim
### Respondeat Superior

181. Each paragraph of this Complaint is incorporated as if restated fully herein.

182. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

183. Defendant City of Chicago is liable as principal for all torts committed by its agents.

184. In committing the acts alleged in the preceding paragraphs, Defendants Johnson and Valentini were members of, and agents of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment and under color of law.

185. Defendant Cook County is liable as principal for all torts committed by its agents.

## Count XI – State Law Claim
### Indemnification

186. Each paragraph of this Complaint is incorporated as if restated fully herein.

187. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

188.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

189.    Defendant Cook County was at all times material to this complaint the employer of Defendants Johnson and Valentini, and is therefore responsible for any judgment entered against Defendants Johnson and Valentini and for any judgment entered against him during said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff, HAROLD RICHARDSON, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, Chicago Police Department Detectives KENNETH BOUDREAU, RICHARD PALADINO, JAMES CASSIDY, THOMAS COUGHLIN, WILLIAM FOLEY, FRANK VALADEZ, and PAT MCCAFFERTY, Chicago Police Sergeant LAWRENCE TUDIER, Assistant Cook County State's Attorney's FABIO VALENTINI and TERENCE JOHNSON, COOK COUNTY, ILLINOIS, and as-yet unknown City of Chicago Employees, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, HAROLD RICHARDSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,


/s/ David B. Owens
One of Plaintiff's Attorneys

Jon Loevy
Russell Ainsworth
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3FL
Chicago, IL 60607